74 P.3d 686 (2003)
118 Wash.App. 61
STATE of Washington, Respondent,
v.
Victor Matthew DAVID, Appellant.
No. 49075-3-I.
Court of Appeals of Washington, Division 1.
August 18, 2003.
*687 Oliver R. Davis, Wash. App. Project, Seattle, WA, for Respondent.
David F. Thiele, Mary K. Webber, Seth A. Fine, Snohomish Co. Pros. Att. Office, Everett, WA, for Appellant.

OPINION PUBLISHED IN PART
BAKER, J.
Victor David lived with his disabled wife, Linda David, on a small sailboat. David acted as Linda's guardian and received state funding to provide care for her. After several *688 unsuccessful attempts by state employees to examine Linda, police were called to investigate. They found Linda living in squalor with severe facial disfigurement and several broken bones. The State charged David with assault in the second degree. The first trial resulted in a hung jury. A second trial yielded a guilty verdict, and the court sentenced David to the 10-year maximum.
On appeal David argues that the court erred by (1) refusing to give a missing witness instruction, (2) failing to excuse two jurors for cause, (3) refusing a change of venue, (4) refusing to give a unanimity instruction, and (5) imposing an exceptional sentence. He also argues that the prosecutor committed misconduct. We find no reversible error, and affirm.

FACTS
In the 1960s and early 1970s Linda Pitt was an active young woman with no apparent injuries or physical disabilities. She rode and cared for her horses, and was able to walk up and down stairs, hold a job, and take care of children. She attended a school for the mentally and physically challenged.
Linda married Victor David in 1980 and they lived at various locations on the Tacoma waterfront in the 1980s and early 1990s. The Davids received supplemental income through the State Department of Social and Health Services (DSHS) and through the Social Security Administration. David was Linda's designated attendant care worker under the state program. In order to maintain eligibility, Linda's needs had to be assessed every 18 months. Linda was evaluated by DSHS social worker Lammert Funk in 1992. At that time, Linda appeared to be of sound mind. She did not have apparent injuries to her face.
In 1993, social worker Harlan Eagle Bear met with the Davids outside a Tacoma restaurant to reevaluate Linda for continued benefits through DSHS. According to Eagle Bear, Linda was mentally oriented, did not have any memory impairment, and appeared to be able to see. David told Eagle Bear that Linda needed total assistance with ambulation, transfers, and personal hygiene, as well as other basic activities of daily living. David told Eagle Bear that Linda required a wheelchair. Eagle Bear observed no injuries to Linda's face.
For a period of time, the Davids lived on their two boats tied up to some pilings behind Berg Scaffolding at the end of the Thea Foss Waterway in Tacoma. Periodically, David had contact with the employees of Berg Scaffolding. No one from the business had contact with Linda, although David told the employees that she lived on the boat. She was seldom seen on the boat. David told the employees that Linda was an invalid with multiple sclerosis and that he was doing everything he could to take care of his wife. Around this time, David told his friend, Gary Inman, that Linda was injuring herself due to her disability, but poverty prevented him from providing better care for her.
In August 1994, David invited Jerome Johnson, a producer with KIRO Television to his boat. David had an ongoing battle with illegal drug activity on the Thea Foss Waterway and had frequently called the police to report it. David wanted to report his concern that the police were not doing enough to abate illegal drug activity.
Johnson met with both of the Davids on their boats. Johnson testified later that the Davids were impoverished but content. He said that the Davids' boat was "livable" and that he would have called the authorities if it was not. Linda appeared to be able to see Johnson. Linda moved slowly and had a reddish nose like an alcoholic, but she had no visible injuries on her face.
In September 1995, the Davids moved to Seacrest Marina in Everett. People living at the marina saw David frequently, but never with anyone else. David rejected numerous offers from other residents at the marina to have Linda on shore for a visit. David did not have water or power hooked up to the boats. He did have a small generator. Residents noted that David would be gone from his boat for days at a time.
In July 1996, Social Security Administration field representative Frank Mendez visited the boats to evaluate Linda. David refused *689 to let him see her and became angry. Mendez ultimately left without seeing Linda.
Six months later, social worker James Mead attempted to meet with Linda. David refused and became angry. Mead called the police. Officer Jonathan Jensen arrived on the boat and found Linda lying on a berth surrounded by several large dogs. Linda was too weak to remove a printer that had fallen on her legs. Linda was removed from the boat and placed in a nursing home. Mead testified that Linda's ears were cauliflowered, her nose and face were scarred, and when she was taken from the boat she said she wanted to be back home. X-rays revealed several fractures in Linda's arms. Linda was functionally blind, wheelchair bound, and required substantial assistance.
David was charged with one count of assault in the second degree committed "on or about September 1993 to January 31, 1997," and one count of alien in possession of a firearm. The first trial occurred in September and October of 2000. Linda was shown to be competent by the prosecution and was called as a State's witness. She testified on direct that David assaulted her, but on cross testified that David never hurt her and that her injuries were a result of falling on board the boat. At the close of the first trial, the jury could not reach a verdict on the assault charge, and the trial court declared a mistrial.
Six months later the second trial against David commenced. This time, the State did not call Linda as a witness. The jury found David guilty of one count of assault in the second degree as charged. The trial court imposed an exceptional sentence of 10 years, the statutory maximum. David appeals.

ANALYSIS

A. Missing Witness Instruction
David contends that a missing witness instruction[1] was required in this case. He argues that Linda was peculiarly available to the State and not called as a witness because her testimony would have been damaging to the State's case. We do not agree that Linda was peculiarly available to the State.
"A party's failure to produce a particular witness who would ordinarily and naturally testify raises the inference in certain circumstances that the witness's testimony would have been unfavorable."[2] To invoke the missing witness rule and obtain an instruction in a criminal case, the defendant is not required to prove that the prosecution deliberately suppressed unfavorable evidence. Instead, the defendant must establish circumstances which would indicate, as a matter of reasonable probability, that the prosecution would not knowingly fail to call the witness in question unless the witness's testimony would be damaging.[3]
The missing witness instruction is appropriate only when the uncalled witness is "peculiarly available" to one of the parties. For a witness to be peculiarly available to one party to an action, there must have been such a community of interest between the party and the witness, or the party must have so superior an opportunity for knowledge of a witness, that it was reasonably probable that the witness would have been called to testify for such party except for the fact that the testimony would have been damaging.[4] A trial court's refusal to give a *690 requested instruction is a matter of discretion and will not be disturbed on review except upon a clear showing of abuse of discretion.[5]
David asserts that he did not have direct access to Linda, but that the prosecutor had ongoing contact on multiple occasions with "[Linda's guardian] regarding limitations that could be placed on the scope of defense discovery of [Linda's] medical records through preemptive motions for protective orders." We find no support for this assertion in the record. Because Linda was a victim of domestic violence, defense counsel did not have direct access to Linda, but neither did the prosecutor. For Linda's protection, at the request of her guardian, only the court had knowledge of Linda's whereabouts. The court notified defense counsel prior to trial that it would make Linda available for interviews, and that either party could call her as a witness at trial. We conclude that because Linda was not peculiarly available to the State, the court did not abuse its discretion in refusing to offer the missing witness instruction.

B. Challenges for Cause
David next contends that the trial court erroneously denied his challenges for cause during jury selection. He argues that jurors 17 and 32 were biased against him because they were exposed to media accounts which portrayed him as guilty. Based upon the record, we conclude that the trial court did not abuse its discretion in denying the juror challenges.
As a threshold matter, the State argues that because David failed to use all of his peremptory challenges, he waived his right to challenge the impartiality of the jury, and therefore cannot argue that the two jurors were biased. Our Supreme Court rejected that argument in State v. Fire:[6]
[I]f a defendant believes that a juror should have been excused for cause and the trial court refused his for-cause challenge, he may elect not to use a peremptory challenge and allow the juror to be seated. After conviction, he can win reversal on appeal if he can show that the trial court abused its discretion in denying the for-cause challenge.[7]
Thus, a defendant need not use all of his peremptory challenges before he can show prejudice arising from the selection and retention of a particular juror. In fact, the opposite is true, if a defendant exhausts his peremptory challenges to remove a juror after denial of a for-cause challenge, the defendant cannot then argue on appeal that he was prejudiced by the denial of the for-cause challenge, because the juror was not seated.[8]
The Sixth Amendment and article I, section 22 of the Washington Constitution guarantee every criminal defendant the right to a fair and impartial jury. To ensure this right, a juror will be excused for cause if his or her views would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[9]
The denial of a challenge to a juror for cause is within the trial court's discretion.[10] We defer to the judgment of the trial judge regarding whether a particular juror is able to be fair and impartial, because the trial judge is in the best position to evaluate "`the fairness of a juror by the juror's character, mental habits, demeanor, under questioning and all other data which may be disclosed by the examination.'"[11]
However, if a potential juror demonstrates actual bias, the trial court must excuse *691 that juror for cause.[12] Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging."[13]
Juror Hinch (No.17)
David points to Hinch's statements during voir dire that she had seen newspaper and television coverage regarding his case, and that the news was unfavorable to the defendant. She also admitted to having seen Linda's face on television, and that the attorneys in the case were concerned that "we have formed a preconceived idea of [the case]."
But examination of the record, 17 pages in all for Hinch, reveals no actual bias by this juror. She declared no bias against David. Hinch stated that she had seen reports one or two years before regarding the David case and knew with certainty that the news reports never portrayed the whole story. She also promised that she would only consider the evidence produced at trial and completely disregard any prior news accounts, and stated that she had no opinion as to David's guilt. The trial court did not abuse its discretion in denying the for-cause challenge to Hinch.
Juror Woldeit (No. 32)
Woldeit initially stated that she had formed an opinion as to David's guilt: "When you read something like that, you tend to think the person you are reading about is guilty." When asked by the court if she would be able to set aside the opinions she formed from the news accounts and afford the defendant the presumption of innocence she answered, "I believe so." The prosecutor then attempted to rehabilitate her:
Prosecutor: I will ask you, do you understand the need and right for a fair trial means the defendant is completely innocent as he sits there right now?
Woldeit: By all means.
Prosecutor: You agree with that completely?
Woldeit: Totally.
Prosecutor: Do you think that anything you heard on TV or read in the newspaper is evidence admitted in Court?
Woldeit: I would assume so. I don't know. I have never been involved in a court proceeding before.
Woldeit later stated that "in every case, a person deserves a fair trial" and that it would be her goal to decide the case based upon what she heard in the courtroom. When asked by the defense whether she could presume David's innocence she stated, "I feel comfortable that I can do it. It would be difficult to do, but I feel comfortable that I can do it."
Woldeit's responses were equivocal. But equivocal answers alone do not require that a juror be removed when challenged for cause.[14] The question is whether a juror with preconceived ideas can set them aside, and the trial judge is best situated to determine a juror's competency to serve impartially.[15] Because of the deference owed to the trial court, we conclude that it did not manifestly abuse its discretion in denying David's for-cause challenge of Woldeit.
For the foregoing reasons, we affirm the judgment and sentence.
The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.
KENNEDY and COX, JJ., concur.
NOTES
[1] WPIC 5.20 reads:

If a party does not produce the testimony of a witness who is [within the control of] [or] [peculiarly available to] that party and as a matter of reasonable probability it appears naturally in the interest of the party to produce the witness, and if the party fails to satisfactorily explain why it has not called the witness, you may infer that the testimony that the witness would have given would have been unfavorable to the party, if you believe such inference is warranted under all the circumstances of the case.
11 Washington Pattern Jury Instructions: Criminal 5.20, at 130 (2d.3d.1994).
[2] State v. McGhee, 57 Wash.App. 457, 462-463, 788 P.2d 603 (1990).
[3] State v. Davis, 73 Wash.2d 271, 280, 438 P.2d 185 (1968) (citing 2 Wigmore, Evidence § 286 (3d ed.1940)).
[4] Davis, 73 Wash.2d at 277, 438 P.2d 185 (holding that an uncalled undersheriff, who was an eyewitness to the interrogation in question and worked closely with the county prosecutor's office, was peculiarly available to the prosecution).
[5] State v. Picard, 90 Wash.App. 890, 902, 954 P.2d 336 (1998).
[6] 145 Wash.2d 152, 34 P.3d 1218 (2001).
[7] Fire, 145 Wash.2d at 158, 34 P.3d 1218.
[8] Fire, 145 Wash.2d at 165, 34 P.3d 1218.
[9] State v. Hughes, 106 Wash.2d 176, 181, 721 P.2d 902 (1986) (quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).
[10] State v. Witherspoon, 82 Wash.App. 634, 637, 919 P.2d 99 (1996).
[11] State v. Noltie, 116 Wash.2d 831, 839, 809 P.2d 190 (1991) (quoting Lewis H. Orland & Karl B. Tegland, Washington Practice: Trial Practice § 203, at 332 (4th ed. 1986)).
[12] Ottis v. Stevenson-Carson Sch. Dist. No. 303, 61 Wash.App. 747, 752-53, 812 P.2d 133 (1991).
[13] RCW 4.44.170(2).
[14] State v. Rupe, 108 Wash.2d 734, 749, 743 P.2d 210 (1987).
[15] Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); State v. Gosser, 33 Wash.App. 428, 434, 656 P.2d 514 (1982).